UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| In re § | | Case No. 18-42066 |
| § | | (Chapter 7) |
| STEVE SEHYUK LEE, § | | |
| § | | |
| Debtor. § | | |
| _____ § | | |
| MICHELLE CHOW, as Chapter 7 Trustee, § | | |
| § | | Adv. Proc. No. 20-4036 |
| Plaintiff, § | | |
| § | | |
| v. § | | |
| § | | |
| JUNG S. LEE, KWANG H. LEE, STEVE § | | |
| SEHYUK LEE, AND SANGEUN LEE, § | | |
| § | | |
| Defendants. § | | |

## MEMORANDUM OPINION AND ORDER

On March 24, 2021, the Court conducted a trial on the complaint filed by Michelle H. Chow, the Chapter 7 trustee, against the Debtor, Steve Sehyuk Lee, the Debtor's non-filing spouse, Sangeun Lee, and the Debtor's parents, Jung S. Lee and Kwang H. Lee (collectively, the "**Defendants**"). The trustee contends that the bankruptcy estate includes a house the Debtor and his non-filing spouse helped his parents purchase pre-petition as well as a tax refund the Debtor and his non-filing spouse received post-petition. The trustee also seeks to avoid and recover as constructively fraudulent certain pre-petition monthly payments the Debtor and his non-filing spouse made to the Debtor's parents as well as the pre-petition purchase of a Honda (and the related monthly payments by the Debtor) for the Debtor's mother. The trustee seeks a judgment (1) requiring turnover of the house or its value and the tax refund under 11 U.S.C. §§ 542(a) and 549; and (2) avoidance of pre-petition transfers to the Debtor's parents as constructively fraudulent

1

under 11 U.S.C. §§ 548 and 550 of the Bankruptcy Code and Texas Business and Commerce Code §§ 24.005(a)(2) and § 24.006.

The Court exercises its core jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A), (E), (H) and (O). This Memorandum Opinion embodies the Court's findings of fact and conclusions of law. *See* FED. R. BANKR. P. 7052.[1]

## FACTS

1. The Debtor filed a voluntary petition under Chapter 7 of Title 11 of the United States Code (the "**Bankruptcy Code**") on September 14, 2018 (the "**Petition Date**"). The Court duly appointed Linda Chow as the Chapter 7 trustee.

2. Prior to bankruptcy, in or around 2005, the Debtor moved to the Dallas area and took a management position with a technology firm. The Debtor's spouse worked full-time as a director of finance for a hotel chain.

3. The Debtor asked his parents to leave their jobs and move in with him to help take care of his infant son. The Debtor's parents closed their business and moved in with the Debtor in 2005. The Debtor's parents were in their late 50s when they moved in with the Debtor.

4. After closing their business, the Debtor's parents had no income other than support provided by their children, including the Debtor. The Debtor and his spouse began claiming the Debtor's parents as their dependents on their federal income tax returns in 2006.

5. The Debtor's father testified that, as the Debtor's family grew, there was not enough space in the Debtor's house for everyone.

---

[1] To the extent any of the following findings of fact are construed as conclusions of law, they are hereby adopted as such. Likewise, to the extent any of the following conclusions of law are construed as findings of fact, they are hereby adopted as such.

6. Accordingly, in or around October 2008, the Debtor helped his parents obtain a loan to purchase a home located at 5816 Clearwater Drive, The Colony, Texas 75056 (the "**Clearwater House**"). The names of the Debtor, the Debtor's non-filing spouse, and the Debtor's mother are on the deed to the house, and the deed of trust also includes the Debtor's father. The Debtor testified that his parents could not have obtained a loan to purchase a home on their own due to their age and lack of assets.

7. It was understood at the time of the purchase of the Clearwater House that the Debtor's parents would reside in the Clearwater House and that the Clearwater House would belong to the Debtor's parents. To that end, the parties understood that the Debtor's parents would make all decisions relating to the Clearwater House and would pay the mortgage.

8. The purchase price of the Clearwater House was $177,767.00. The down-payment of $32,561.43 was made by the Debtor and his non-filing spouse. The mortgage payment for the Clearwater House was approximately $1,162 per month, which the Debtor's parents paid. According to the Debtor's bankruptcy schedules, the value of the Clearwater House on the date of filing was $242,527, and $8,700 remained on the mortgage.

9. The Debtor and his family reside in a home in Lewisville, Texas, which is approximately seven miles from the Clearwater House. The Debtor and his father testified that the Debtor never intended to live in the Clearwater House and, in fact, has never lived in the Clearwater House. All decisions regarding the Clearwater House, including decisions regarding its construction, have been made by the Debtor's parents.

10. No bus route or other public transit runs between the Clearwater House and the Debtor's home. The Debtor's parents use cars to commute to the Debtor's home.

11. Since at least 2008 when the Debtor's parents moved into the Clearwater House, the Debtor and his non-filing spouse have made monthly payments ranging from $1,400 to $2,400 to the Debtor's parents. In his response to the Chapter 7 trustee's interrogatories, the Debtor stated that he supports his parents because of his love and affection for them – and because they are his dependents. In addition, the Debtor testified at trial that his parents cook for his household, clean, and help care for his children.

12. The Debtor's father testified that he and his spouse also receive payments from their daughter deposited directly into their bank account.

13. The Debtor and his spouse have paid for the homeowner's insurance and annual property taxes relating to the Clearwater House. The Debtor testified that, for the past several years, the annual property taxes had been approximately $5,500.

14. In February 2012, the Debtor and a partner formed EG2 Mobile Technology ("**EG2**"). EG2 was in the business of refurbishing the LCD monitor (front cover) of smart phones. EG2 primarily worked on Apple products. EG2's net revenue was approximately $3.6 million in 2013 and rose to approximately $10.4 million for 2015 and to $9.4 million for 2016.

15. In September 2015, the Debtor co-signed on a loan to purchase a 2015 Honda Accord (the "**Honda**") for his mother to use. On the Certificate of Title, the Debtor and his mother are listed as owners of the Honda.

16. The purchase price of the Honda was $22,564.56. The Debtor and his spouse made all the monthly payments ($332.09 each month) for the Honda directly to the finance company. The Debtor's parents made insurance payments relating to the Honda. As of the petition date, the Debtor's bankruptcy schedules indicate that the Honda was worth $17,335.

17. EG2 occasionally took out loans to refinance other business debts and buy equipment. The Debtor guaranteed some of EG2's obligations; his wife was not a guarantor. Specifically, the Debtor signed three guarantees in favor of Green Bank, N.A. dated November 15, 2013 ($300,000), May 20, 2016 ($573,202.86), and May 8, 2017 ($888,290).

18. The Debtor became insolvent when he signed the third guaranty in favor of Green Bank, N.A., on May 8, 2017.

19. In or around September 2017, Apple changed its policy regarding the refurbishment of its products. Apple's new policy required its products to be sent to the manufacturers in China for repair. Apple's new policy erased more than 70% of EG2's business. The Debtor testified that he had no warning of the policy change prior to its enactment.

20. On September 12, 2017, EG2 retained an attorney to prepare a bankruptcy petition for EG2. The Debtor stopped drawing a salary from EG2 in October 2017. The Debtor's wife, however, continued to support the Debtor's parents by, among other things, making monthly payments to the Debtor's parents from her salary and paying the finance company for the Honda.

21. On December 12, 2017, EG2 filed a voluntary petition under Chapter 7 of the Bankruptcy Code in the Northern District of Texas. The Debtor initiated this bankruptcy approximately nine months later to discharge his debts related to the guarantees; his spouse did not join in his bankruptcy petition.

22. In his bankruptcy schedules, the Debtor listed liabilities of $2.72 million and indicated that his debts were primarily non-consumer debts. Those non-consumer debts were related to the failure of the Debtor's business, EG2. The Court entered an order discharging the Debtor of these debts on December 19, 2018.

23. The Debtor listed his parents as dependents in his bankruptcy schedules. He also included the monthly payments to his parents in his "Schedule J: Your Expenses."[2]

24. On or about March 21, 2019, the Debtor and his spouse jointly filed a 1040 U.S. Individual Income Tax Return for the 2018 tax year (the "**2018 Tax Return**"). The 2018 Tax Return indicates that the Debtor was a "Finance Manager" and that his spouse was a "Director of Financial Analysis" during the 2018 tax year. The Debtor explained at trial that he did not have any income during 2018 and that "Finance Manager" was simply a description he had used in prior tax years.

25. On the 2018 Tax Return, the Debtor and his spouse reported earning wages and salaries of $201,467 during 2018. However, all this income was earned by the Debtor's spouse. The Debtor enrolled in divinity school after the failure of EG2 in 2017 and had no income in 2018.

26. The Debtor and his spouse used a net operating loss carryforward related to EG2 in the amount of $36,757 and a capital loss carryforward related to EG2 in the amount of $3,000 to reduce their taxable income by nearly $40,000. The Debtor and his spouse also used a charitable contribution carryforward from 2017 to reduce their income. Through the use of carryforwards and charitable deductions in the total amount of approximately $93,000 from prior tax years, the Debtor and his spouse reduced their taxes to zero and obtained a refund of the full $26,862 in taxes withheld from the salary of the Debtor's spouse in 2018 (the "**2018 Tax Refund**").

---

[2] Section 707(b)(2) contains a "means test" for determining whether the granting of relief would be an abuse of the Bankruptcy Code. The allowable expenses in § 707(b)(2)(ii) illustrate that, in considering which expenses should be deducted from a debtor's current monthly income, Congress focused on those expenses necessary to protect the health and safety of the family – including expenses associated with the "care and support of an elderly, chronically ill, or disabled household member," housing, utilities, food, and safety of the home. *In re Campbell*, 2019 WL 722759, at *2 (Bankr. S.D. Fla. Feb. 19, 2019). *See also In re Axline*, 618 B.R. 454, 464 (Bankr. N.D. Tex. 2020) (discussing 11 U.S.C. § 707(b)(2)(A)(ii)(II)).

27. In the Debtor's underlying bankruptcy case, the Chapter 7 trustee filed a Motion for Turnover of Tax Refund on December 2, 2019. The trustee sought to recover the 2018 Tax Refund as property of the bankruptcy estate pursuant to 11 U.S.C. § 542(a).[3]

28. The Debtor opposed the trustee's turnover motion.

29. The Court conducted a hearing on the trustee's turnover motion on January 21, 2020. During the hearing, the Court requested that the parties brief their respective positions regarding the community property interest of the Debtor and his non-filing spouse in the carryforwards they used to produce the 2018 Tax Refund, and the Court continued the hearing to March 3, 2020. However, prior to March 3, 2020, the trustee withdrew the turnover motion and instituted this adversary proceeding.

30. At the time of the trial on March 24, 2021, the Debtor was working as a full-time pastor but was not receiving any salary. The Debtor's federal income tax returns reflect that the Debtor has not received any income since he stopped drawing a salary from EG2.

31. The Debtor and his father testified at trial. Other than the trial testimony of the Debtor's father, the Debtor's parents have not involved themselves in this adversary proceeding.

## ANALYSIS

In this adversary proceeding, the Chapter 7 trustee seeks a judgment that the 2018 Tax Refund is property of the Debtor's bankruptcy estate and that any additional refund which the

---

[3] Section § 542(a) provides:

(a) Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. § 542(a).

Debtor and his spouse receive in the future on account of the pre-bankruptcy capital loss carryforward (or any charitable deduction attributable to the Debtor) would be property of the bankruptcy estate. The Chapter 7 trustee also asserts that the Debtor owns the Clearwater House and, therefore, the Clearwater House is property of the bankruptcy estate. Finally, the Chapter 7 trustee seeks to recover the value of the Honda as well as the monthly payments made to the Debtor's parents from at least September 8, 2017, which is the date the Debtor consulted a bankruptcy attorney for EG2, through the petition date as constructively fraudulent transfers.

### The 2018 Tax Refund

1. Upon the filing of a bankruptcy petition, the Bankruptcy Code creates an estate. *See* 11 U.S.C. § 541(a). Property of the estate includes "[a]ll interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is—(A) under the sole, equal or joint management and control of the debtor; or (B) liable for an allowable claim against the debtor, or for both an allowable claim against the debtor and an allowable claim against the debtor's spouse, to the extent that such interest is liable." 11 U.S.C. § 541(a)(2).

2. The term "community property" is not defined by the Bankruptcy Code but is a term of art used to describe property that may be purchased or held by a married person living in a state such as Texas that uses a community property system. *In re Robertson,* 203 F.3d 855, 859 (5th Cir. 2000); *In re Trammell,* 399 B.R. 177, 182 (Bankr. N.D. Tex. 2007).[4]

---

[4] Property is characterized as separate or community under Texas law by "the rule of implied exclusion" – that is, if an asset is not defined as separate property, that asset is community property. *In re Wiggains*, 2015 WL 1954438, at *7 (Bankr. N.D. Tex. Apr. 28, 2015), *aff'd sub nom.*, *Matter of Wiggains*, 848 F.3d 655 (5th Cir. 2017). The Texas Constitution defines separate property as "property acquired before marriage or during marriage by gift, devise, or descent." TEX. CONST. art. XVI § 15. The Texas Family Code further defines separate property as consisting of: (1) the property owned or claimed by the spouse before marriage; (2) the property acquired by the spouse during marriage by gift, devise, or descent; and (3) any recovery for personal injuries sustained by the spouse during marriage, except any recovery for loss of earning capacity during marriage. TEX. FAM. CODE § 3.101. "Each spouse has the sole management, control, and disposition of that spouse's separate property." TEX. FAM. CODE § 3.101.

8

3. Texas Family Code § 3.002 states that community property is "property, other than separate property, acquired by either spouse during the marriage." *Barnett v. Barnett*, 67 S.W.3d 107, 111 (Tex. 2001). The Texas Family Code divides "community property" into two sub-types: solely managed and jointly managed.

4. Under § 3.102(a) of the Texas Family Code, "each spouse has the sole management, control, and disposition of the community property that the spouse would have owned if single, including (1) personal earnings; (2) revenue from separate property; (3) recoveries for personal injury; (4) the increase and mutations of, and the revenue from, all property subject to the spouse's sole management, control and disposition." TEX. FAM CODE § 3.102(a). "Otherwise, all community property is subject to the joint management, control, and disposition of the spouses unless the spouses provide otherwise in writing or other agreement." TEX. FAM CODE § 3.102(c).

5. Only jointly managed community property becomes property of the bankruptcy estate. *See* 11 U.S.C. § 541(a)(2).

6. According to the Fifth Circuit, as personal earnings are under "the sole management and control of the spouse who earned them, the tax refund generated from excess withholding of those earnings is as well." *Ragan v. Comm'r of Internal Revenue,* 135 F.3d 329, 333 (5th Cir. 1998) (citing *In re Bathrick,* 1 B.R. 428, 430 (Bankr. S.D. Tex. 1979)). Applying § 541(a)(2)(A), the Fifth Circuit further held that "to the extent that the income is attributable to one spouse's sole management community property, the refund from the excess tax on that income is the sole management community property of that spouse." *Ragan,* 135 F.3d at 333. When there is an overpayment of income taxes by married couples, the overpayments "are apportionable to each spouse to the extent that he or she contributed to the overpaid amount." *Id*. at 333.

9

7. In this case, the Debtor has not had any income since 2017. The 2018 Tax Refund involved an overpayment of taxes by the Debtor's non-filing spouse. Nonetheless, the trustee asserts the 2018 Tax Refund is property of the estate because the Debtor and his spouse used the Debtor's pre-bankruptcy tax attributes to obtain it.

8. The parties in this case do not dispute that the Debtor's pre-bankruptcy tax attributes, such as a net operating loss relating to the failure of EG2, are property of the bankruptcy estate. *See, e.g., In re Feller*, 218 F.3d 948, 953 (9th Cir. 2000) ("Congress intended that NOLs not be beyond the trustee's grasp. Instead, this valuable asset was to be used for the benefit of the estate."); *In re Russell*, 927 F.2d 413 (8th Cir. 1991); *In re Prudential Lines, Inc.*, 928 F.2d 565, 573 (2nd Cir. 1991) ("We hold that the right to a carryforward attributable to its $74 million NOL was property of PLI's bankruptcy estate."). The Chapter 7 trustee, therefore, seeks to recover the bulk of the 2018 Tax Refund from the Debtor's spouse as a "proceed" of property of the estate.[5] *See* 11 U.S.C. § 541(a)(6); *In re McLain*, 516 F. 3d 301, 313 (5th Cir. 2008) (stating that if "property of the bankruptcy estate, were used to generate some type of property interest, that subsequent property interest is part of the bankruptcy estate ....").

9. However, as stated above, the sole source of income attributable to the 2018 Tax Refund was derived from the employment of the non-debtor spouse. The 2018 Tax Refund is a return of the non-filing spouse's wages to her, and her wages are not property of the Debtor's bankruptcy estate. Therefore, the Court concludes that the 2018 Tax Refund is not property of the estate and is not subject to turnover to the Chapter 7 trustee.

10. Nonetheless, the Debtor and his spouse did not have authority to use the net operating losses, which are the Debtor's pre-bankruptcy tax attributes, in their 2018 Tax Return.

---

[5] The Debtor and the trustee disagree about the size of the refund the Debtor's non-filing spouse would have received without using the Debtor's pre-bankruptcy tax attributes.

10

Those attributes belonged to the Debtor's bankruptcy estate. Although it is not clear how the trustee can use the Debtor's pre-bankruptcy tax attributes, the Court will require the Debtor and his non-filing spouse to take whatever steps are necessary, if requested by the Chapter 7 trustee in writing with 14 days of entry of this Memorandum Opinion and Order, to return the net operating losses to the estate by amending their 2018 Tax Return.

### The Clearwater House

11. During the March 24th trial, counsel for the Chapter 7 trustee clarified that the trustee is not seeking to establish that the Debtor fraudulently transferred the Clearwater House to the Debtor's parents. (As discussed below, the Debtor helped his parents purchase the Clearwater House long before the statutory reachback period for fraudulent transfers.) Rather, the trustee seeks to establish that the Debtor owns the Clearwater House and, therefore, the Clearwater House is property of the Debtor's bankruptcy estate. The trustee seeks a judgment compelling the Debtor's parents to turn over the value of the Clearwater House, which the trustee asserts was $270,674 as of the petition date.

12. The Debtor and his spouse contend that the Debtor's parents are the true owners of the Clearwater House notwithstanding the fact that the Debtor and his spouse are included with his mother on the deed to the house. The Debtor and his spouse contend that, to the extent they hold legal title to the Clearwater House, the Clearwater House is held in a resulting trust for the benefit of the Debtor's parents.[6] Thus, as the parents have equitable title to the Clearwater House

---

[6] In his answer to the Chapter 7 trustee's complaint, the Debtor asserts that he and his spouse were mere "accommodation parties" with respect to the Clearwater House. Under the Uniform Commercial Code, an accommodation party is one who "signs the instrument for the purpose of incurring liability on the instrument without being a direct beneficiary of the value given for the instrument." TEX. BUS. COM. CODE § 3.419(a). If a party signs an instrument as an accommodation party, *i.e.,* in any capacity for the sole purpose of lending her credit to another party to the instrument, then the accommodation party is not liable to the party accommodated in an action for contribution, *see Darden v. Harrison,* 511 S.W.2d 925, 927 (Tex. 1974), and is entitled to reimbursement after paying the debt on the primary obligor's behalf, *see In re Kelly*, 582 B.R. 905, 913 (Bankr. S.D. Tex. 2018). The burden of proving accommodation party status is on the party asserting the status. *FDIC v. Blanton,* 918 F.2d 524, 530 (5th Cir.

11

and the Debtor only legal title, the Debtor contends that the bankruptcy estate has no interest in the property.

13. A bankruptcy estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). But under § 541(d) of the Bankruptcy Code:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, ***becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property,*** but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d) (emphasis added).

14. To determine the nature and extent of the Debtor's interest in the Clearwater House under § 541(d), the court must look to state law. *In re Haber Oil Co., Inc.,* 12 F.3d 426 (5th Cir. 1994) ("[I]n the absence of controlling federal bankruptcy law, the substantive nature of the property rights held by a bankrupt and its creditors is defined by state law.").

15. Under Texas law, a resulting trust arises by operation of law when title is conveyed to one person but all or part of the purchase price is paid by another. *Cohrs v. Scott,* 338 S.W.2d 127, 130 (1960). "The parties are presumed to have intended that the grantee hold title to the use of him who paid the purchase price and whom equity deems to be the true owner." *Id.* The trust arises out of the transaction and must arise at the time title passes. *Id. See also Sheldon Petroleum Co. v. Peirce,* 546 S.W.2d 954, 957-58 (Tex. Civ. App. – Dallas, 1977) ("Due to the nature of the doctrine, it is necessary that the party seeking to impose the trust trace his interest into the

---

1990) (applying Texas law). However, at the time of trial, the Debtor's parents had fully paid the mortgage for the Clearwater House. The Debtor and his spouse are not seeking any reimbursement from his parents with respect to the Clearwater House, and the issue of whether they acted as accommodation parties appears irrelevant.

consideration which is given when legal title to specific property is passed to the person against whom the trust is asserted.").

16. In *Wright v. Wright*, 132 S.W.2d 847, 849 (Tex. 1939), the Texas Supreme Court stated in dicta:

> It is familiar law that a [resulting] trust must result, if at all, at the very time a deed is taken and the legal title vested in the grantee. No oral agreement before or after the title is vested, will create a resulting trust, unless the payments are made in pursuance of an enforceable agreement upon the part of the beneficiary existing at the time the deed is executed. The trust must arise out of the transaction itself. The fundamental idea is that the beneficial title follows consideration, and unless the one claiming the trust has paid consideration, or become bound for same, at the very time of the making of the deed, no trust is created.

Two years later, a Texas appellate court held that a resulting trust arose under similar circumstances: "If one agrees to advance the consideration to acquire property in his own name for the benefit of another and the conveyance of the legal title is made to him in accordance with such agreement, a trust arises if the beneficiary is legally bound to repay the money advanced to purchase the property." *Vicars v. Quinn,* 154 S.W.2d 947, 948–49 (Tex. Ct. App. – El Paso, 1941). In *Vicars*, for example, a mother and son orally agreed that property purchased through a loan from a relative would be taken in the name of the son for the joint benefit of the son and mother. The court held this agreement created a trust for the benefit of the mother, and her one-half interest was awarded to her in a decree of partition. *Id.* The court also awarded the son an equitable lien to secure her obligation to repay the money advanced to purchase the property. *Id*. at 949.

17. More recently, in *In re Kang*, 2013 WL 870223 (Bankr. S.D. Tex. Mar. 6, 2013), the debtors purchased a house for the debtor-husband's parents. Other than signing the loan used to purchase the home, the debtors had no financial involvement with the property. The debtor-husband's parents paid the down payment and made the monthly mortgage payments. However,

13

the debtors were listed as the record owners of the property when they filed for bankruptcy, and the Chapter 7 trustee sued for turnover under § 542 of the Bankruptcy Code.

18. After discussing *Wright* and *Williams*, the bankruptcy court in *Kang* ruled that the bankruptcy estate held legal title to the property subject to the parents' full equitable interest in the property: "It is undisputed that before or concurrent with the initial conveyance of the property to the debtors, the parents and debtors agreed that the parents would be obligated to pay the note (secured by a Deed of Trust on the property). As a result, a resulting trust arose at the time of the conveyance. The estate (as successor-in-interest to the debtors) holds legal title to the property in a resulting trust for the parents, who have equitable title." *Id.* at *5.

19. The present case differs from *Wright*, *Kang*, and *Vicars* inasmuch as there is no proof of any agreement that the down payment on the Clearwater House was a loan to the Debtor's parents that his parents were obligated to repay. Rather, in the present case, the down payment appears to have been a gift to the Debtor's elderly parents, who had closed their business to help him raise his children.

20. Under Texas law, when parents pay the purchase price for property and place title in the name of their child, and vice-versa, a presumption of gift arises. *Equitable Trust Co. v. Roland,* 721 S.W.2d 530, 533 (Tex. App.—Corpus Christi 1986) (joint venture interest placed in name of the son for use and benefit of his mother); *Murphy v. Metropolitan Life Ins. Co.,* 498 S.W.2d 278, 282 (Tex. Civ. App.—Houston [14th Dist.] 1973) (husband gave wife's share of the community interest in a life insurance policy to his mother). No resulting trust exists until the presumption is rebutted by clear and convincing evidence that the payor intended to retain a beneficial interest in the property. *Equitable Trust Co.,* 721 S.W.2d at 533.

14

21. In *Amador v. Berrospe*, 961 S.W.2d 205 (Tex. App. – Houston [1st Dist], 1996), a son-in-law (Berrospe), with his wife (Petra), purchased a house with community funds for his father-in-law. After the father-in-law's death, the son-in-law brought an action against his brother-in-law, who claimed one-eighth interest in the house as an heir. In the context of the parties' dispute over ownership of the property, the appellate court explained:

> A purchase money resulting trust is implied in law when someone, other than the person in whose name title is taken, pays the purchase price of the property. *Nolana Dev. Ass'n v. Corsi,* 682 S.W.2d 246, 250 (Tex.1984); *Estate of Lee v. Ring,* 734 S.W.2d 123, 125 (Tex. App.—Houston [1st Dist.] 1987, no writ). The intent of purchasers seeking to have beneficial title vested in themselves must be determined from the facts and circumstances existing at the time of the transaction out of which the resulting trust is sought to be established. *Uriarte v. Petro,* 606 S.W.2d 22, 24–25 (Tex. Civ. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.).
>
> Although a resulting trust may be shown by proof that another paid the purchase price, there is an exception to this rule when parents pay the purchase price for the property and place title in the name of their child, and vice-versa. *Equitable Trust Co. v. Roland,* 721 S.W.2d 530, 533 (Tex. App.—Corpus Christi 1986, writ ref'd n.r.e.); *Murphy v. Metropolitan Life Ins. Co.,* 498 S.W.2d 278, 282 (Tex. Civ. App.—Houston [14th Dist.] 1973, writ ref'd n.r.e.). In this situation, a presumption of gift arises, and no resulting trust exists until the presumption is rebutted. *Equitable Trust Co.,* 721 S.W.2d at 533.

*Id.* at 207 (Tex. App. – Houston [1st Dist.], 1996). The court in *Amador* concluded that the son-in-law and his wife intended to give the property to the father-in-law at the time of purchase. *Id.* at 208.

22. In this case, the Court finds that the preponderance of the credible evidence establishes that the down payment for the Clearwater House was a gift to the Debtor's parents, who had been living with them for several years while helping to care for their children and manage their household. The Debtor's parents had closed their business at the Debtor's request and were financially dependent on the Debtor and his spouse. The Debtor and his spouse helped the Debtor's parents obtain financing for the balance of the purchase price by signing the loan documents.

23. The Debtor and his spouse have never resided at the Clearwater House. The Debtor and his spouse did not receive any direct benefit from helping the Debtor's parents obtain a loan to purchase the Clearwater House. The Debtor, his spouse, and his parents understood and intended at the time of purchase that the Clearwater House would belong to the Debtor's parents, and the Debtor's parents would make the monthly mortgage payments. The Debtor's parents have made all decisions regarding the Clearwater House and the Clearwater House is the parents' homestead.

24. The Debtor was not the sole source of income for his parents. His parents have made all the monthly mortgage payments with their income from the Debtor and his spouse as well as income from the Debtor's sister. The payments to the Debtor's parents from the Debtor and his spouse reflect his parents' dependency on them, their duty and obligation to the Debtor's parents, as well as compensation for the assistance the Debtor and his spouse receive from his parents.

25. The Court finds and concludes, under these circumstances, that the Debtor and his spouse were included on the title and deed of trust to aid the Debtor's parents – not because they intended to retain any beneficial interest in the property. The Court further concludes that the Debtor holds legal title as a co-owner of the Clearwater House subject to a resulting trust for the Debtor's parents, who hold equitable title as well as legal title as a co-owner. Since the Debtor holds only a legal interest in the Clearwater House, the Clearwater House is not property of his bankruptcy estate. The Chapter 7 trustee has failed to establish grounds for turnover under § 542 of the Bankruptcy Code.

## Constructively Fraudulent Transfers

26. The Chapter 7 trustee seeks to recover all the payments the Debtor made to his parents from the date of his insolvency through the petition date as constructively fraudulent transfers. The Chapter 7 trustee also seeks to recover the value of the Honda as of the petition date as a constructively fraudulent transfer.

27. To establish the existence of a constructively fraudulent transfer under 11 U.S.C. § 548(a)(1)(B), a plaintiff must show:

> (1) the debtor transferred an interest in property;
> (2) the transfer of that interest occurred within one year prior to the filing of the bankruptcy petition;
> (3) the debtor was insolvent on the date of the transfer or became insolvent as a result thereof; and
> (4) the debtor received less than reasonably equivalent value in exchange for such transfer.

*In re GWI PCS 1 Inc.,* 230 F.3d 788, 805 (5th Cir. 2000); *Chow v. Prince (In re Prince),* 2012 WL 1095506, at *6 (Bankr. E.D. Tex., Mar. 30, 2012).

28. The § 548 reachback period is limited to two years. *See* 11 U.S.C. § 548(a)(1). Thus, in this case, any transfer occurring prior to September 14, 2016 is beyond the scope of avoidance under § 548.

29. Under 11 U.S.C. § 544(b), a transfer may also be set aside in accordance with state law. *Joe T. Dehmer Distributors, Inc. v. Murry Owen Temple,* 826 F.2d 1463, 1466 (5th Cir. 1987). Section 544 allows the trustee to step into the shoes of a creditor for the purpose of asserting causes of action under state fraudulent conveyance laws and confers on the trustee the status of a hypothetical creditor or bona fide purchaser as of the commencement of the case. *Stettner v. Smith (In re IFS Financial Corp.),* 669 F.3d 255, 261 n. 3 (5th Cir. 2012).

30. Texas state law provides for the recovery of a constructively fraudulent transfer on a showing substantially similar to that required by the Bankruptcy Code. *Prince,* 2012 WL 1095506, at *6; *In re Enron Corp.,* 2005 WL 6237551, at *43 (Bankr. S.D. Tex., Dec. 9, 2005). *See* Texas Uniform Fraudulent Transfer Act ("**TUFTA**"), codified at TEX. BUS. & COMM. CODE § 24.001 *et seq*. However, unlike § 548, the reachback period for fraudulent transfers under Texas law is four years. *See* TEX. BUS. & COMM. CODE § 24.010(a)(2).

31. TUFTA provides that a transfer is constructively fraudulent as to both present and future creditors if such a transfer was made without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor:

> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transactions; or
> (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

5 TEX. BUS. & COMM. CODE § 24.005(a).

32. TUFTA further provides, as to a present creditor, that:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

TEX. BUS. & COMM. CODE § 24.006(a).

33. A party seeking to avoid a transfer under § 548 or under TUFTA bears the burden of proving the required elements, including the debtor's insolvency and the absence of reasonably equivalent value. *See, e.g., Ingalls v. STMC Corp. (In re SMTC Mfg.),* 421 B.R. 251, 279 (Bankr. W.D. Tex. 2009); *Anderson v. Mega Sys., LLC,* 2007 WL 1643182, at *6 (Bankr. E.D. Tex., June 4, 2007).

34. Thus, under either section, the three elements the Chapter 7 trustee must prove with respect to the challenged transfers is that: (1) a transfer occurred within the reachback period; (2) no reasonably equivalent value was received by the Debtor for such transfer; and (3) the Debtor was insolvent when that transfer occurred or became insolvent as a result of the transfer.

35. In this case, the acquisition of the Honda occurred prior to the Debtor's insolvency. The Debtor's business was flourishing when he helped his mother acquire the Honda for her use. The Court, therefore, concludes that the purchase of the Honda was not a constructively fraudulent transfer.

36. Next, the Chapter 7 trustee seeks to recover all the payments the Debtor made for the Honda as well as the monthly payments to the Debtor's parents from the date he became insolvent, which the Chapter 7 trustee asserts occurred in September 2017 (when the Debtor consulted with a bankruptcy attorney for EG2), through the petition date as constructively fraudulent under Texas law.

37. As previously discussed, however, the Court finds that the Debtor became insolvent when he signed a third guaranty in favor of Green Bank on May 8, 2017. From May 8, 2017 through September 2017, the Debtor made five payments directly to the finance company for the Honda in the amount of $332.09 each (for a total payment of $1,660). The Debtor also made five monthly payments to his dependent parents totaling $8,335.

38. The Debtor had no income after September 2017. The source of the continued payments to the Debtor's parents and for the Honda after September 2017 was his spouse's income. As discussed above, her income was her sole management community property, *see* TEX. FAM CODE § 3.102(a), and a non-filing spouse's sole management community property is not drawn into the bankruptcy estate by 11 U.S.C. § 541(a)(2).

19

39. Thus, the Court concludes that the Chapter 7 trustee established that the payments the Debtor made (1) to the financing company for the Honda and (2) to his parents after May 2017 (when he became insolvent) and before October 2017 (when he stopped drawing a salary from EG2) were constructively fraudulent. Accordingly, the Court concludes that the Chapter 7 trustee is entitled to a judgment against the Debtor's parents for the total amount of $9,955.[7]

## CONCLUSION

For the foregoing reasons, it is

**ORDERED** that, if requested by the Chapter 7 trustee in writing within 14 days of entry of this Order, the Debtor and his non-filing spouse shall amend their 2018 Tax Return to remove any loss carryforwards relating to the Debtor's failed business and any charitable contributions attributable to the Debtor. It is further

**ORDERED** that payments to the Debtor's parents in the total amount of $9,995 were constructively fraudulent. It is further

**ORDERED** that the Chapter 7 trustee's motion for partial summary judgment (as to the 2018 Tax Refund) [Dkt. No. 15] and the Chapter 7 trustee's motion for discovery sanctions [Dkt. No. 21] are **DISMISSED** as moot. It is further

**ORDERED** that the Court will schedule a separate hearing to consider the Chapter 7 trustee's request for her attorney's fees.

Signed on 12/13/2021

*Brenda T. Rhoades*  MD
HONORABLE BRENDA T. RHOADES,
CHIEF UNITED STATES BANKRUPTCY JUDGE

---

[7] This figure corrects the Court's oral ruling on April 21, 2021, which inadvertently included payments made by the Debtor's spouse from her own wages.